**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Jean S. O'Byrne,                                          Civil No. 13-284 (DSD/SER)

      Plaintiff,

v.                                                        **REPORT AND RECOMMENDATION**

Carolyn W. Colvin,
Acting Commissioner of Social Security,[1]

      Defendant.

---

Edward C. Olson, Esq., 331 Second Avenue S., #420, Minneapolis, MN 55401, for Plaintiff.

Ann M. Bildtsen, Esq., Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Defendant.

---

STEVEN E. RAU, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Jean S. O'Byrne ("O'Byrne") seeks review of the Commissioner of Social Security's ("Commissioner") denial of her application for social security disability insurance ("SSDI"). (Compl.) [Doc. No. 1]. The parties filed cross-motions for summary judgment [Doc. Nos. 17 and 22] that have been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends O'Byrne's motion for summary judgment be denied, and the Commissioner's motion be granted.

## I.   BACKGROUND

### A.   Procedural History

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013. http://www.ssa.gov/pressoffice/factsheets/colvin.htm

O'Byrne protectively filed an application for disability insurance benefits ("DIB") on May 12, 2008, alleging a disability onset date of August 2, 2005.[2]  (Admin. R. at 179-84) [Doc. No. 7].   O'Byrne claimed disability due to fibromyalgia, pain and weakness, fatigue, ankle numbness, osteoarthritis, and hearing loss.  (*Id.* at 219).  O'Byrne's application was denied initially on March 24, 2009, and denied on reconsideration.  (*Id.* at 129-33, 139-41).  O'Byrne requested a hearing.  (*Id.* at 143).  Administrative Law Judge ("ALJ") Richard N. Staples heard the matter on September 29, 2010, and issued an unfavorable decision on November 23, 2010. (*Id.* at 104-26, 77-92).  The Appeals Council denied O'Byrne's request for review on December 11, 2012.  (*Id.* at 1-4).  The denial of review rendered the ALJ's decision final.  *See* 42 U.S.C. § 405(g); *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).  O'Byrne now seeks judicial review pursuant to 42 U.S.C. § 405(g).  O'Byrne argues that the ALJ failed to fully and fairly develop the record concerning her mental impairments and limitations.  (Pl's Mem. at 8-11) [Doc. No. 18].  She does not challenge the ALJ's physical residual functional capacity finding. The Court, therefore, will address O'Byrne's physical impairments only as background.

**B.     O'Byrne's Background and Testimony**

O'Byrne was 55-years-old on her alleged onset date.  (Admin. R. at 181).  She last worked as a school administrator and counselor from 1990 through June 2005.  (*Id.* at 220, 228). In 1993, she was injured at work when a door struck her knee.  (*Id.* at 113).  She brought a worker's compensation claim, and continued to receive treatment for those injuries in 2007.  (*Id.* at 769-70, 803, 807-08).

O'Byrne suffered back and leg pain, causing her to leave her job as a school administrator in June 2005, through her employer's disability program.  (*Id.* at 112).  At the time

---

[2] At the administrative hearing, O'Byrne's representative amended the alleged disability onset date to June 15, 2005, the claimant's 55th birthday.  (Admin. R. at 108).

of the hearing, O'Byrne lived by herself but her father was with her most of the time.  (*Id.* at 114).  O'Byrne testified that she had trouble remembering, she was distracted, and she could not focus. (*Id.* at 116).  She was not seeing a psychiatrist.  (*Id.*)  She experienced constant pain, which medication alleviated somewhat; the pain, nevertheless, was severe enough to "throw off" her concentration.  (*Id.*)

O'Byrne completed her first function report for the Social Security Administration ("SSA") on January 16, 2009.  (*Id.* at 249-56).  During the day, she took care of her dog, made simple meals, talked on the phone or visited with people, read the newspaper, checked her email, watched television, listened to music, sang and played piano.  (*Id.* at 249, 251).  O'Byrne reported that her impairments affected every function, including mental tasks.  (*Id.* at 254).  John O'Byrne, a relative, corroborated O'Byrne's report.  (*Id.* at 240-47).  O'Byrne completed another function report six months later.  (*Id.* at 422-29).  She reported that her physical impairments and symptoms caused her to feel extremely anxious and depressed.  (*Id.* at 422-23, 427-28).  She spent her days sleeping and resting.  (*Id.* at 423).  Stress made all of her conditions worse.  (*Id.* at 428).

### C.     Medical Evidence

Several months before her alleged disability onset date, O'Byrne self-referred to Medical Pain Clinics ("MAPS") for treatment of back, right leg and knee pain.  (*Id.* at 705).  Her pain began in 1993, and then in November 2004, she tore the meniscus in her right knee.  (*Id.*)  Her pain was constant, affecting her sleep.  (*Id.*)  Work activity and emotional stress increased her pain.  (*Id.*)  She had tried the following medications, which were not helpful:  Darvon, Percocet, Vicodin, Valium, Xanax, Celebrex, ibuprofen, Relafen, and Vioxx.  (*Id.*)  Her job involved low physical exertion, moderate emotional distress and a neutral relationship with her employer.

(*Id.*)   Dr. Thomas Cohn diagnosed multilevel pain and requested copies of O'Byrne's prior MRIs.  (*Id.* at 706).

O'Byrne continued pain treatment at MAPS.   On April 12, 2005, she complained primarily of back pain, and her nurse noted that O'Byrne was emotionally labile with rapid speech pattern.  (*Id.* at 702).   A few months later, another nurse at MAPS noted O'Byrne's affect was flat, but her mental status examination was otherwise normal.  (*Id.* at 694).   Although O'Byrne's chief complaint was back pain, she admitted to general malaise, anxiety and palpitations.  (*Id.* at 692).   On the same day, O'Byrne saw Dr. Natalie Christensen for hypothyroidism, and Dr. Christensen noted O'Byrne appeared anxious.  (*Id.* at 583).

O'Byrne engaged in six sessions of physical therapy at MAPS and was discharged on July 20, 2005, after she failed to return for her last session.  (*Id.* at 667-68).   Her goal for physical therapy was to carry her own luggage on an extended trip to Europe,[3] without increasing her symptoms.  (*Id.*)   The same day she was discharged from physical therapy, O'Byrne presented Dr. Cohn with a disability form to complete on her behalf.  (*Id.* at 681).   She was quite upset when Dr. Cohn declined to complete the form unless she first underwent a functional capacity evaluation.  (*Id.*)   When O'Byrne returned for pain treatment several months later, her mental status examination was normal.  (*Id.* at 672).

Almost a year after she left her job through her employer's disability program, O'Byrne told Dr. Lissette Giraud, whom she was seeing for throat irritation, that she had to give lectures as part of her job, and she did a lot of talking on the phone.  (*Id.* at 619).   Contrary to O'Byrne's report to Dr. Giraud, Dr. Cohn wrote an addendum to O'Byrne's medical records in October

---

[3] After O'Byrne went to Ireland, she was evaluated for chronic headaches in October 2005, several months after she was struck on the head by a suitcase that fell out of the overhead compartment.  (Admin. R. at 1062).

2006, apparently at her behest, noting she had been off work since August 2005 due to pain.  (*Id.* at 666).

O'Byrne was preparing for a hearing in her worker's compensation case in October 2007, regarding her 1993 injury.  (*Id.* at 769, 771).  At the end of October, O'Byrne saw Physician Assistant Kara Gratton for back pain management.  (*Id.* at 649-52).  O'Byrne's mental status examination was normal but Gratton commented, "[p]atient does not stop going on about her many pains.  She has a list of issues to address.  Patient seems extremely focused on her current aches and pains."  (*Id.* at 651-52).  O'Byrne was referred for a behavioral health evaluation.  (*Id.* at 652).

On March 10, 2008, O'Byrne saw Dr. Mark Mount for sinus, ear and throat problems.  (*Id.* at 569).  O'Byrne had been "quite active" singing in the church choir recently.  (*Id.*)  She recently had an upper respiratory infection while in California "doing some sort of concert work."  (*Id.*)  Dr. Mount suggested that O'Byrne take a couple of weeks off from singing after her upcoming Easter concerts.  (*Id.*)

O'Byrne was referred to Dr. Mayra Oberto-Medina for a rheumatology consultation on July 9, 2008, regarding her diffuse pain and long list of physical complaints.  (*Id.* at 567-68).  Dr. Oberto-Medina believed that O'Byrne displayed significant anxiety during evaluation and "a very strange affect."  (*Id.* at 567).  Dr. Oberto-Medina believed O'Byrne had an underlying psychiatric disorder triggering some of her symptoms, and she might have a psychosomatic disorder.  (*Id.* at 568).

The Administrative Record contains a letter O'Byrne wrote to Dr. Oberto-Medina after O'Byrne read Dr. Oberto-Medina's account of their consultation.  (*Id.* at 351-52).  O'Byrne wrote, in part:

When you inquired about psychiatric history, I told you that I had passed the tough psychiatric screening done by the Dept. of State in selecting Peace Corps Volunteers and was chosen out of more than a thousand applicants to serve for two years in a third world country.  It is indeed significant that none of the above appears in your report.

In your letter to my doctor, you speak several times about "significant anxiety," "strange affect," "questionable fibromyalgia," with "no apparent psychiatric history," yet which you "believe is a possible psychosomatic disorder since complaints are diffuse and what you believe is an underlying psychiatric disorder triggering some of the symptoms."  This was written out of context, and with no reference to any of the present precipitating circumstances [about] which I spoke.  It leaves a grossly inaccurate conclusion based on **meeting me only one time, when I was ill, this important fact was omitted from your report.** . . . Furthermore, what you have written is harmful to me because others may view it now as history.

I request that you rewrite the report and stay within the boundaries of your competence, inclusive of the information of which I spoke.  Reports get a life of their own so there is a responsibility not to overstate any conclusion.  It needs to be corrected and the original destroyed. . .

(*Id.*)  O'Byrne's submissions to the SSA Appeals Council show O'Byrne reported Dr. Oberto-Medina to the Minnesota Board of Medical Practice.  (*Id.* at 17).  O'Byrne, however, argued to the Appeals Council that she suffered severe impairments of anxiety, depression and stress.  (*Id.* at 8).

On January 26, 2009, Chiropractor Robert Parkinson wrote a letter on O'Byrne's behalf, stating he had treated her regularly since January 2005, when she began having trouble performing her job.  (*Id.* at 861).  He believed her pain was severe, and cognitive ability was impaired mildly.  (*Id.* at 863).  Dr. Parkinson noted that O'Byrne had done "a little work as a

substitute, but sporadic and nothing extensive," since her disability began in August 2005.  (*Id.* at 862).[4]

O'Byrne underwent a psychological consultative examination with Dr. Phillip Sarff on March 11, 2009.  (*Id.* at 865-69).  O'Byrne said she was living alone but her father stayed with her at times.  (*Id.* at 865).  She had always been a good student, and she had two Master's degrees, one in guidance and counseling and one in school administration.  (*Id.*)  Her most recent employment was as an assistant principal in a middle school.  (*Id.* at 866).  She started developing physical problems on the job in January 2005, and she applied for and was granted long-term disability benefits through the school system.  (*Id.*)  She never had complaints about her work and never had difficulty getting along with others.  (*Id.*)  O'Byrne denied any history of mental health treatment.  (*Id.*)  She was content with her friendships, she got along with her family, and she interacted with people at church.  (*Id.*)

At her examination with Dr. Sarff, O'Byrne was alert and oriented, with normal rate and volume of speech, although rather soft-spoken.  (*Id.*)  Her eye contact was fleeting, and she appeared to be in pain when walking.  (*Id.*)  She was cooperative, logical and coherent but somewhat inhibited and guarded at times.  (*Id.* at 867).  She seemed to be holding back certain aspects of her history.  (*Id.*)  Her social skills were pleasant.  (*Id.*)  Her affect was normal for the

---

[4] The SSA's Detailed Earnings Query dated June 9, 2010, shows that O'Byrne had the following earnings after her alleged disability onset date:  (1) in 2006:  Redondo Beach Unified School District, $1,430.00; Los Angeles Unified School District, $163.24; Lawndale School District, $4,058.00; Anoka-Hennepin School District, $462.00; County of Hennepin, $224.00; County of Anoka, $110.00; (2) in 2007:  Palos Verdes Peninsula, $749.70; Redondo Beach Unified School District, $1,962.50; Lawndale School District, $3,699.33; Aubry's Enterprises Inc., $1,730.00; Anoka-Hennepin School Dist., $867.00; County of Hennepin, $392.00; (3) in 2008:  Palos Verdes Peninsula, $899.70; Redondo Beach Unified School District, $1,812.50; Lawndale School District, $1,671.00; County of Hennepin, $168.00; (4) in 2009:  Palos Verdes Peninsula, $367.50; Redondo Beach Unified School District, $1,000.00; Lawndale School District, $1,595.00; and County of Hennepin, $336.00.  (Admin. R. at 202-04).

situation.  (*Id.*)  When asked about her mood, O'Byrne responded by describing her physical complaints, and when asked about her emotional life, she said "I feel fine as far as I know."  (*Id.*) She did not think she had significant bouts of depression, but she had trouble sleeping.  (*Id.*)  She denied that her trouble sleeping was caused by lying awake worrying.  (*Id.*)  She reported positive self-esteem and denied the following symptoms:  hopelessness, anhedonia, trouble controlling her temper, and tendencies toward nervousness, worry, tension or obsessive/compulsive traits.  (*Id.*)  She denied physical symptoms of anxiety but endorsed difficulty concentrating and focusing.  (*Id.*)  She said her job had been stressful.  (*Id.*)  She did not report problems with short-term memory but noticed that she could not read for a long time because she was distracted.  (*Id.*)  She denied any history of phobias, panic attacks or suicidal ideation.  (*Id.*)  Dr. Sarff did not diagnosis any psychological disorders.  (*Id.* at 869).  He assessed O'Byrne with a GAF score of 65.[5]  (*Id.*)

Dr. Sarff wrote the following summary and recommendations:

> Jean O'Byrne is a 58-year-old female who is likely functioning in the high average range of intelligence based on her reported level of academic and vocational achievement (i.e., achieving a couple of Master's degrees).  Her short-term memory, as measured by her ability to remember three of three things after 30 minutes, was grossly intact. Her concentration skills were good for simple tasks, but she struggled with more demanding tasks such as reciting numerical sequences in reverse and doing serial-seven subtractions.  Subjectively, she reports having concentration issues, and it is likely related to her physical condition.
>
> Ms. O'Byrne has never really had mental health treatment, and she seemed to have difficulty articulating her emotional life.  She

---

[5] The Global Assessment of Functioning Scale ("GAF"), a scale of 0 to 100, is used by clinicians to subjectively rate the social, occupational and psychological functioning of adults.  *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV-tr") 32 (American Psychiatric Association 4th ed. text revision 2000).  Scores between 61 and 70 are associated with some mild symptoms such as depressed mood and mild insomnia, but the individual is generally functioning pretty well and has some meaningful relationships.  *Id.* at 34.

seemed guarded about some of those issues, as well.  A Minnesota
Multiphasic Personality Inventory-2 would have been useful.
There may be psychological factors that affect her physical
condition, but not enough to account for her physical impairments.
There is no evidence that she is making up symptoms or even
exaggerating symptoms.  When asked directly, she denied overt
symptoms of depression or anxiety, other than being frustrated
about her poor health.

Based on today's evaluation, Ms. O'Byrne appears capable of
understanding and following simple and repetitive directions.  She
will not have difficulty remembering directions over time.  She
appears to have the ability to do simple tasks with adequate
persistence, but her pace on mental tasks was observed to be slow.
She is very unlikely to initiate conflict with coworkers and
supervisors and is very unlikely to have any type of interpersonal
difficulties on the job.  She should be able to handle normal
amounts of stress and pressure in the workplace, and if anything,
she is much more likely to develop physical symptoms in reaction
to stress.

(*Id.*)

In October 2009, when O'Byrne was treated for thyroid dysfunction, she was in no acute

distress, and she was pleasant and oriented with appropriate mood and affect.  (*Id.*)  Her mental

status was unchanged the following month.  (*Id.* at 958).

Chiropractor John Valentini wrote a letter to O'Byrne's disability attorney in September

2010, to provide his opinion of her functioning.  (*Id.* at 1024-27).  He opined that O'Byrne

suffered continuous pain, making it impossible for her to focus and concentrate.  (*Id.* at 1026).

Over the last year, she worked as a substitute teacher for only a few days.  (*Id.* at 1025-26).

O'Byrne submitted evidence to the Appeals Council[6] after the ALJ denied her claim.

The evidence included a September 20, 2010 letter written by Tonny Godeschalk, CORT.[7]  (*Id.*

---

[6] *See* Appeals Council Order.  (Admin. R. at 1-4).  Exhibits 1A through 38F were submitted to
the SSA before the administrative hearing.  (*Id.* at 107).  Exhibits 39F through 43F (*Id.* at 1033-
1102) were submitted to the Appeals Council.
[7] The acronym "CORT" is not defined.

at 1097).  Godeschalk wrote O'Byrne had displayed generalized anxiety disorder since August 2005.  (*Id.*)  Most days, she displayed extreme worry and anxiety about everyday things.  (*Id.*)  O'Byrne developed physical symptoms "when a perceived worrisome episode or circumstance arises."  (*Id.*)  Godeschalk further noted that O'Byrne had taken various medications for anxiety, which were ineffective, and had attended a support group for six years.  (*Id.*)  Attached to the letter, Godeschalk included several anxiety inventories O'Byrne completed, with test scores showing severe anxiety.  (*Id.* at 1098-1100).

### D.      State Agency Physician Opinions

On March 24, 2009, Dr. Sharon Fredericksen reviewed O'Byrne's Social Security disability file and completed a Psychiatric Review Technique form regarding O'Byrne's mental impairments.  (*Id.* at 893-906).  She found that O'Byrne did not have a medically determinable mental impairment.  (*Id.* at 893).  In support of her conclusion, Dr. Fredericksen cited Dr. Sarff's report, O'Byrne's daily activities, and the fact that O'Byrne was not taking "psych meds" or engaging in psychotherapy.  (*Id.* at 905).  On June 9, 2009, Dr. Ray Conroe reviewed O'Byrne's Social Security disability file upon reconsideration of her claim.  (*Id.* at 950-52).  He affirmed Dr. Fredericksen's opinion.  (*Id.* at 952).

### E.      Evidence from the Vocational Expert

L. David Russell testified at the hearing as a vocational expert.  (*Id.* at 118-24).  The ALJ instructed him to assume an individual of the same age, education and work experience as O'Byrne.  (*Id.* at 122-23).  The individual would be limited to lifting, carrying, pushing and pulling five pounds frequently and ten pounds occasionally.  (*Id.*)  The individual could sit for six hours in a normal eight-hour workday, and stand or walk for two hours.  (*Id.* at 123).  The individual required a cane for walking, could not perform tasks that required good bilateral

hearing, and had to watch people's lips to understand what they were saying. (*Id.*) The ALJ asked whether such an individual could perform O'Byrne's past relevant work, assuming her hearing loss was not severe enough to prevent communication, and Russell responded that she could. (*Id.*)

For a second hypothetical question, the ALJ asked whether the same individual, who would also be off task 20% of the time, would be able to perform O'Byrne's past relevant work. (*Id.*) Russell testified she would not. (*Id.* at 124). Furthermore, if the first hypothetical individual was limited to understanding and following simple and repetitive instructions, and her pace on mental tasks was slow, she would be unable to perform O'Byrne's past relevant work. (*Id.*)

### F.    The ALJ's Decision

On November 23, 2010, the ALJ issued a decision finding that O'Byrne was not disabled under sections 216(i) and 223(d) of  the Social Security Act. (*Id.* at 77-92).  In finding that O'Byrne was not disabled, the ALJ employed the required evaluation process considering:  (1) whether O'Byrne was engaged in substantial gainful activity; (2) whether O'Byrne had severe impairments; (3) whether O'Byrne had an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; and (4) whether, based on O'Byrne's residual functional capacity, she could perform her past relevant work. *See* 20 C.F.R. § 404.1520(a)(4).

At the first step of the evaluation, the ALJ found O'Byrne had not engaged in substantial gainful activity since June 15, 2005, her alleged onset date. (*Id.* at 82).  At the second step, the ALJ found that O'Byrne had severe impairments of chronic pain disorder, fibromyalgia, chronic fatigue disorder, degenerative disc disease, osteoarthritis, and partial bilateral hearing loss. (*Id.*)

The ALJ agreed with Dr. Sarff's conclusion that O'Byrne did not have mental impairments, but he disagreed with Dr. Sarff's statements that suggested O'Byrne would be limited to simple, repetitive tasks at a slow pace.  (*Id.* at 84).

At step three, the ALJ concluded O'Byrne did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)  At step four of the evaluation, the ALJ determined O'Byrne had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567, but was precluded from tasks that require unimpaired bilateral hearing, and that she required a cane to ambulate.  (*Id.*)  The ALJ found O'Byrne could perform her past relevant work as a counselor, director of counseling, and dean of students.  (*Id.* at 86).  Therefore, O'Byrne was not under a disability, as defined in the Social Security Act, from June 15, 2005 through the date of the decision.  (*Id.*)

## II.    STANDARD OF REVIEW

The standards governing the award of Social Security disability benefits are congressionally mandated: "[t]he Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992).  "Disability" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).  A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

## A.   Administrative Review

If a claimant's initial application for benefits is denied, she may request reconsideration of the decision.  20 C.F.R. § 404.909(a)(1).  A claimant who is dissatisfied with the reconsidered decision may seek an ALJ's administrative review.  20 C.F.R. § 404.929.  If the claimant is dissatisfied with the ALJ's decision, the claimant may seek Appeals Council review, although that review is not automatic.  20 C.F.R. §§ 404.967–982.  If the request for review is denied, then the ALJ's decision is final and binding upon the claimant unless the matter is appealed to a federal district court.  42 U.S.C. § 405(g); 20 C.F.R. § 404.981.  An appeal to a federal court of either the Appeals Council or the ALJ's decision must occur within sixty days after notice of the Appeals Council's action.  *Id.*

## B.   Judicial Review

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive.  42 U.S.C. § 405(g).  This Court's review of the Commissioner's final decision is deferential because the decision is reviewed "only to ensure that it is supported by 'substantial evidence in the record as a whole.'" *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (citation and internal quotation marks omitted)).  A court's task is limited to reviewing "the record for legal error and to ensure that the factual findings are supported by substantial evidence." *Id.*

The "substantial evidence in the record as a whole" standard does not require a preponderance of the evidence but rather only "enough so that a reasonable mind could find it adequate to support the decision." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).  Yet, this Court must "consider evidence that detracts from the Commissioner's decision as well as

evidence that supports it." *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000). Thus, a "notable difference exists between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989) (internal citation omitted).

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis. In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* (internal citation omitted).

In reviewing the ALJ's decision, this Court analyzes the following factors: (1) the ALJ's findings regarding credibility; (2) the claimant's education, background, work history, and age; (3) the medical evidence provided by the claimant's treating and consulting physicians; (4) the claimant's subjective complaints and description of impairments; (5) third parties' corroboration of the claimant's physical impairment; and (6) the VE's testimony based on proper hypothetical questions that fairly set forth the claimant's impairments. *Brand v. Sec'y of the Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980). Proof of disability is the claimant's burden. 20 C.F.R. § 404.1512(a). Thus, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

Reversal is not appropriate "merely because the evidence is capable of supporting the opposite conclusion." *Hensley*, 352 F.3d at 355. If substantial evidence on record as a whole permits one to draw two inconsistent positions and one of those represents the Commissioner's findings, then the Commissioner's decision should be affirmed. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). This Court's task "is not to reweigh the evidence, and [the Court]

14

may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [the Court] would have decided the case differently." *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

## III.   DISCUSSION

O'Byrne alleges the ALJ failed to fully develop the record concerning the effect her impairments have on her ability to concentrate, remember, and perform other mental aspects of highly skilled work.  (Pl's Mem. at 7-8).  O'Byrne contends the following evidence should have induced the ALJ to further develop the record:   (1) examining source comments on her preoccupation with her physical impairments; (2) mention of her anxiety and strange affect; (3) an examining source's suspicion that psychological factors were affecting how she perceived her symptoms; (4) Dr. Sarff's statement that an MMPI-II would have been helpful; and (5) errors O'Byrne made in her mental status examination with Dr. Sarff.  (*Id.* at 8-10).  O'Byrne contends the ALJ should have contacted Dr. Sarff to explain why he did not diagnose a mental impairment, given O'Byrne's performance on the mental status examination, and his opinion that she was limited to simple tasks.  (*Id.* at 9-10.)

The Commissioner responds that substantial evidence supports the ALJ's decision that O'Byrne did not have a severe medically determinable mental impairment.  (Def's Mem. in Supp. of Mot. for Summ. J. at 8-10) [Doc. No. 23].  The Commissioner asserts the ALJ was not required to further develop the record because O'Byrne's position regarding a mental impairment is diametrically opposed to the position she took at the administrative level, and she now asks the Court to credit evidence she refuted.  (*Id.* at 10-11).  Finally, the Commissioner contends the ALJ was not required to further develop the record because O'Byrne failed to submit evidence of a

mental impairment, and there was sufficient evidence in the record for the ALJ to conclude she did not have a severe mental impairment.  (*Id.* at 12-13).

### A.    Duty to Develop the Record

A Social Security disability claimant must bring to the attention of the SSA "everything that shows you are blind or disabled."  20 C.F.R. § 404.1512(a) (2010).  It is the claimant's responsibility to provide medical evidence "showing that you have an impairment(s) and how severe it is during the time you say that you are disabled.  It is the responsibility of the SSA to develop the claimant's complete medical history for at least the twelve months preceding the month in which the claimant files her application."  *Id.* § 404.1512(d).  The SSA "will make every effort to help [claimants] get medical reports from [their] own medical sources when [the claimants] give [the SSA] permission to request the reports."  *Id.*

An ALJ has the duty to fully and fairly develop the record, independent of the claimant's burden of persuasion to prove disability and to demonstrate RFC.  *Eichelberger v. Barnhart*, 390 F.3d 584, 592 (8th Cir. 2004).  An ALJ must order medical examinations or tests "only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled."  *Jones v. Astrue*, 619 F.3d 963, 969 (8th Cir. 2010) (quoting *Halverson v. Astrue*, 600 F.3d 922, 933 (8th Cir. 2010)).  An ALJ is not required to seek clarifying statements from a treating physician "unless a crucial issue is undeveloped."  *Id.* (quoting *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005) (internal quotation omitted)).  "'[R]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial.'"  *Haley v. Massanari*, 258 F.3d 742, 750 (8th Cir. 2001) (quoting *Shannon*, 54 F.3d 484, 488) (quoting *Onstad v. Shalala*, 999 F.3d 1232, 1234 (8th Cir. 1993)).

16

In response to evidence in the record suggesting O'Byrne was anxious at times, and to Dr. Oberto-Medina's suspicion that O'Byrne had a psychological impairment and possibly a psychosomatic disorder, the SSA ordered a consultative psychological evaluation. (Admin. R. at 892). O'Byrne vehemently denied Dr. Oberto-Medina's suspicion of a psychosomatic disorder, going so far as to report her to a medical review board. (*Id.* at 17, 351-52). Nevertheless, O'Byrne attended the consultative psychological evaluation with Dr. Sarff. (*Id.* at 865-69). She denied symptoms of depression, anxiety or difficulty getting along with others but endorsed impaired concentration. (*Id.*) In her mental status evaluation, she struggled with serial seven subtractions, but Dr. Sarff did not find a medically determinable mental impairment. (*Id.*) Based on the record as a whole, the ALJ had sufficient evidence to determine O'Byrne did not have a medically determinable mental impairment. *See Smith v. Astrue*, 232 Fed. Appx. 617, 619 (8th Cir. 2007) (rejecting argument that ALJ should have ordered psychological examination where claimant expressly denied depression); s*ee Johnson v. Chater*, 87 F.3d 1015, 1018-19 (8th Cir. 1996) (although doctors raised the possibility of a conversion disorder and the claimant's emotional problems may have exacerbated her pain, the evidence was sufficient to support the ALJ's finding of no mental impairment).

O'Byrne argues the ALJ should have further developed the record because Dr. Sarff thought a personality test would have been useful in evaluating O'Byrne. (Pl's Mem. at 10). Dr. Sarff observed that O'Byrne had difficulty articulating her emotional life, and seemed guarded "about some of those issues." (*Id.* at 869). O'Byrne's letter to Dr. Oberto-Medina (*Id.* at 351-52), makes evident it was against her interest to have medical records suggesting her physical impairments were not the cause of her disability, which may explain why O'Byrne was guarded about emotional issues with Dr. Sarff. Nonetheless, the ALJ's crediting of O'Byrne's denial of

psychological symptoms to Dr. Sarff was reasonable because there was little in the record to the contrary.  Apart from Dr. Oberto-Medina's observations, there were only a couple of occasions where O'Byrne appeared anxious.  (*Id.* at 702, 583.)  Those occasions were before O'Byrne quit working, and may have been attributable to job stress; afterall, O'Byrne told Dr. Sarff her job was stressful.  (*Id.* at 702, 583).  O'Byrne has the burden of establishing a mental impairment.  If she was disguising mental symptoms to avoid the conclusion that her physical impairments were not the cause of her disability, she did so at the risk of the ALJ concluding she did not have a mental impairment or resulting mental limitations.  *See* 20 C.F.R. § 404.1512(c) (2010) ("You must provide evidence, without redaction, showing how your impairment(s) affects your functioning . . .")

Finally, O'Byrne contends the ALJ should have more fully investigated whether she had a mental impairment because her mental status examination by Dr. Sarff showed that her pace on mental tasks was slow, and she struggled with tasks such as reciting numerical sequences in reverse and serial seven subtractions.  This was the only objective evidence in the record of O'Byrne suffering any cognitive limitations, and her other mental status examinations were normal (Admin. R. at 672, 651, 978).  She never sought treatment or evaluation for impaired concentration, and the ALJ was not required to more fully develop the record before concluding O'Byrne did not have a medically determinable mental impairment.  *See Smith v. Shalala*, 987 F.2d 1371, 1374-75 (8th Cir. 1993) (substantial evidence supported ALJ's decision to discount psychiatrist's opinion of disability where claimant did not allege mental impairment in application for disability, claimant never sought or was referred for psychiatric treatment, and a psychiatric examination revealed no psychiatric disorders).

O'Byrne contends she cannot perform her highly skilled past relevant work because Dr. Sarff concluded she was capable of performing simple tasks. (Pl's Mem. at 7-8). O'Byrne was most recently employed as an assistant principal in a middle school, she told Dr. Sarff she never had any complaints about her work, and her long term disability from her employer was granted based on physical not mental problems. (Admin. R. at 866, 112). Without evidence in the record to support a medically determinable mental impairment, the regulations do not require the ALJ to proceed by considering the severity of any alleged mental symptoms. *See* Social Security Ruling ("SSR") 96-7p, 1996 WL 374186 at *2 (S.S.A. July 2, 1996) ("[n]o symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.") Furthermore, there is evidence in the record of O'Byrne engaging in activities that are inconsistent with disabling limitations in concentration, such as substitute teaching, traveling, and singing in concerts. (Admin. R. at 202-04, 619, 569, 667). *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (describing credibility factors used to evaluate subjective complaints). The ALJ was not required to further develop the record or to include mental restrictions in O'Byrne's residual functional capacity.

After the ALJ issued his unfavorable decision, O'Byrne submitted to the Appeals Council a letter from Tonny Godeschalk, whose profession and relationship with O'Byrne is unclear. (Admin. R. at 1097). In the letter, Godeschalk stated O'Byrne had displayed symptoms of generalized anxiety disorder for years, and her anxiety often manifests as a physical complaint. (*Id.*) When the Appeals Council considers material new evidence but declines review, the court's role is to decide whether the ALJ's decision is supported by substantial evidence in the

record as a whole, including the new evidence. *Mackey v. Shalala*, 47 F.3d 951, 953 (8th Cir. 1995).

Godeschalk's statements about O'Byrne's anxiety are directly contrary to O'Byrne's statements to Dr. Sarff and Dr. Oberta-Medina. (Admin. R. at 867, 351-52.) Godeschalk's assertions are unsupported by mental health treatment records, and O'Byrne denied having mental health treatment. (*Id.* at 867). Furthermore, there is no reason to believe Godeschalk is qualified to diagnose a mental impairment. Only an acceptable medical source can establish the existence of a medically determinable impairment. *Sloan v. Astrue*, 499 F.3 883, 888 (8th Cir. 2007). Godeschalk's letter is entitled to very little, if any, weight. The ALJ's decision is supported by substantial evidence in the record as a whole when this letter is included.

## IV.   RECOMMENDATION

Based on all the files, records, and proceedings herein, IT IS HEREBY RECOMMENDED that:

1.   Plaintiff O'Byrne's Motion for Summary Judgment [Doc. No. 17] be **DENIED**;

2.   Defendant Commissioner's Motion for Summary Judgment [Doc. No. 22] be **GRANTED**;

3.   If this Report and Recommendation is adopted, judgment be entered.

Dated:  May 8, 2014                                    *s/Steven E Rau*
                                                       Steven E. Rau
                                                       U.S. Magistrate Judge

Under D.Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by May 22, 2014, a writing which specifically identifies those portions of the Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within fourteen days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation

does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.